**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**RODNEY WASHINGTON**                                    **CIVIL ACTION**

**VERSUS**                                                          **NO. 19-01570**

**KEITH DEVILLE**                                            **SECTION: "I"(1)**

**REPORT AND RECOMMENDATION**

Petitioner, Rodney Washington, a Louisiana state prisoner, filed this federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254. For the following reasons, it is recommended that the application be **DISMISSED WITH PREJUDICE**.

Petitioner was indicted for the second degree murder of John Wactor and the attempted second degree murder of Carolyn Coleman. At his first trial on those charges, he was found not guilty of Wactor's murder; however, a mistrial was declared with respect to the attempted second degree murder charge because the jury was unable to reach a verdict.[1]

That charge was then retried, and, on June 20, 2013, petitioner was convicted of the attempted manslaughter of Coleman.[2] On December 17, 2013, he was then found to be a multiple offender and was sentenced as such to a term of twenty years imprisonment without benefit of parole, probation, or suspension of sentence.[3] However, the trial court subsequently granted petitioner's motion to reconsider sentence and resentenced him to fifteen years at hard labor without benefit of parole, probation, or suspension of sentence.[4] On appeal, the Louisiana Fifth

---

[1] State Rec., Vol. 1 of 12, minute entry dated February 28, 2013.
[2] State Rec., Vol. 7 of 12, trial transcript, p. 1733; State Rec., Vol. 1 of 12, minute entry dated June 20, 2013; State Rec., Vol. 3 of 12, jury verdict form.
[3] State Rec., Vol. 7 of 12, transcript of December 17, 2013; State Rec., Vol. 1 of 12, minute entry dated December 17, 2013.
[4] State Rec., Vol. 7 of 12, transcript of January 8, 2014; State Rec., Vol. 1 of 12, minute entry dated January 8, 2014.

Circuit Court of Appeal then affirmed petitioner's conviction, amended his sentence to allow for the possibility of parole, and affirmed the sentence as amended.[5] Thereafter, petitioner's related writ application was denied by the Louisiana Supreme Court,[6] and his petition for a writ of certiorari was denied by the United States Supreme Court.[7]

On or about March 29, 2016, petitioner filed a motion to clarify sentence with the state district court.[8] That motion was denied.[9]

On or about May 17, 2017, petitioner filed an application for post-conviction relief with the state district court.[10] That application was denied.[11] Petitioner's related writ applications were then likewise denied by the Louisiana Fifth Circuit Court of Appeal[12] and the Louisiana Supreme Court.[13]

On February 7, 2019, petitioner filed the instant federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254.[14] In its response, the state concedes that the application is timely and that petitioner has exhausted his remedies in the state courts; however, the state argues that petitioner's claims have no merit.[15]

## I.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections

---

[5] State v. Washington, 168 So. 3d 746 (La. App. 5th Cir. 2015); State Rec., Vol. 7 of 12.
[6] State v. Washington, 184 So.3d 704 (La. 2016); State Rec., Vol. 7 of 12.
[7] Washington v. Louisiana, 136 S. Ct. 2417 (2016).
[8] State Rec., Vol. 7 of 12.
[9] State Rec., Vol. 1 of 12, minute entry dated May 4, 2016.
[10] State Rec., Vol. 7 of 12.
[11] State Rec., Vol. 7 of 12, Judgment dated July 28, 2017; State Rec., Vol. 1 of 12, minute entry dated July 28, 2017.
[12] Washington v. State, No. 17-KH-499 (La. App. 5th Cir. Nov. 17, 2017); State Rec., Vol. 8 of 12.
[13] State ex rel. Washington v. State, 262 So. 3d 893 (La. 2019); State Rec., Vol. 8 of 12.
[14] Rec. Doc. 1.
[15] Rec. Doc. 8.

2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002); accord Langley v. Prince, ___ F.3d ___, 2019 WL 2384159, at *6 (5th Cir. June 6, 2019) (noting that the AEDPA imposes a "relitigation bar" on claims adjudicated on the merits by the state court).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (footnotes, internal quotation marks, ellipses, and brackets omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 572 U.S. 415, 426 (2014). However, a federal habeas court must be mindful that "an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694; accord Langley, 2019 WL 2384159, at *6 ("The Supreme Court has repeatedly held that it is not enough to show the state court was wrong."); Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."). Therefore:

> "[T]he [AEDPA's] relitigation bar forecloses relief unless the prisoner can show the state court was *so* wrong that the error was well understood and comprehended in existing law beyond any possibility for fairminded disagreement. In other words, the unreasonable-application exception asks whether it is beyond the realm of possibility that a fairminded jurist could agree with the state court.

Langley, 2019 WL 2384159, at *6 (citations and quotation marks omitted).  "Under AEDPA's

relitigation bar, the very existence of reasonable disagreement forecloses relief."  Id. at *17.

Further, the Supreme Court has expressly cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court
> unreasonably applies this Court's precedent; it does not require state courts to
> extend that precedent or license federal courts to treat the failure to do so as error.
> Thus, if a habeas court must extend a rationale before it can apply to the facts at
> hand, then by definition the rationale was not clearly established at the time of the
> state-court decision.    AEDPA's carefully constructed framework would be
> undermined if habeas courts introduced rules not clearly established under the guise
> of extensions to existing law.

Woodall, 572 U.S. at 426 (citations and quotation marks omitted).  Therefore, when the Supreme

Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's]

favor, it cannot be said that the state court unreasonably applied clearly established Federal law."

Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).

While the AEDPA standards of review are strict and narrow, they are purposely so.  As the

United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion
> was unreasonable.
> 
>        If this standard is difficult to meet, that is because it was meant to be.  As
> amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal
> court relitigation of claims already rejected in state proceedings.  It preserves
> authority to issue the writ in cases where there is no possibility fairminded jurists
> could disagree that the state court's decision conflicts with this Court's precedents.
> It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a guard
> against *extreme malfunctions* in the state criminal justice systems, *not a substitute
> for ordinary error correction through appeal.  As a condition for obtaining habeas
> corpus from a federal court, a state prisoner must show that the state court's ruling
> on the claim being presented in federal court was so lacking in justification that
> there was an error well understood and comprehended in existing law beyond any
> possibility for fairminded disagreement.*

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (emphasis added; citations omitted); see also

Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants – and federal courts –

from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of

state courts.").

      The Supreme Court has expressly warned that although "some federal judges find [28

U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the

law and apply the strictly deferential standards of review mandated therein.  Woodall, 572 U.S. at

417.

## II.  Facts

      On direct appeal, the Louisiana Fifth Circuit Court of Appeal summarized the facts relating

to petitioner's conviction as follows:

> This case stems from shootings that occurred in Laplace on March 28, 2011,
> which resulted in the death of John Wactor and injury to Carolyn Coleman.
>     According to Ms. Coleman, in the early morning hours of March 28, she
> left an off-track betting facility, and as she was walking down the street, two men
> in a truck, subsequently identified as Cornell Bolden and defendant, drove up next
> to her.  After engaging in conversation with the men, Ms. Coleman got into the
> truck being driven by defendant.  The three drove to Mr. Bolden's house so he could
> get his truck, and they then met at a Laplace gas station.  While there, Mr. Bolden
> bought Ms. Coleman some drinks, gave defendant some money, and left by himself.
>     Ms. Coleman and defendant talked about going to a motel to have sex, but
> defendant told her that he did not have enough money.  Ms. Coleman then called
> her close friend, John Wactor, and got permission to use his residence.  The two
> proceeded to Mr. Wactor's trailer on Fir Street.  Before the two exited the truck,
> defendant paid Ms. Coleman sixty dollars for sex.  They then went inside the trailer,
> and Ms. Coleman introduced defendant to Mr. Wactor and confirmed that it was
> still okay for them to use the bedroom.  Ms. Coleman and defendant proceeded to
> the bedroom and had sex.  After they finished and dressed, the two left the bedroom
> and walked by Mr. Wactor, who was sitting on the sofa, to get to the door.  Ms.
> Coleman was apparently in front of defendant, and as she turned the door knob, she
> heard a "pop."  She immediately opened the door and ran until she fell into a ditch.
> Not realizing that she had been shot, Ms. Coleman went back to the trailer to see
> what was going on; however, since she saw that defendant's truck was still there,

she did not go inside but rather stood outside the door. According to Ms. Coleman, defendant was positioned behind his truck and started shooting at her. Ms. Coleman pleaded with defendant not to kill her, at which point he returned to his truck and left. She proceeded to walk down the steps and experienced pain in her back, chest, and leg, which resulted from being shot four times. After defendant left, Ms. Coleman began screaming for someone to help her. A neighbor, who heard the gunshots and Ms. Coleman's screams for help, called 9-1-1.

Deputy John Wetzel and Deputy Arthur Flott were dispatched to the scene. Upon arriving, Deputy Wetzel saw Ms. Coleman lying across the steps to the trailer, and upon entering the back of the trailer, observed Mr. Wactor with a single gunshot wound to the face. Ms. Coleman was subsequently transported to the hospital for treatment of her injuries.

In the meantime, Officer Walter Stevens, who was assigned to investigate the case, viewed the videotape from the gas station that Ms. Coleman and defendant had earlier visited. The tape showed Ms. Coleman with "two black male subjects." Officer Stevens recognized Cornell Bolden as one of the men in the video and brought him in for an interview, at which time he identified the other male with him as defendant. Based on the information learned in his investigation, Officer Stevens went to the hospital and presented Ms. Coleman with a photographic lineup. Ms. Coleman positively identified defendant as the perpetrator. Ms. Coleman was subsequently shown another photographic lineup at the detective bureau, at which time she again positively identified defendant as the person who shot her.

Defendant learned that the officers were looking for him, and he voluntarily went to the investigations bureau for an interview. In his first interview, defendant denied meeting Ms. Coleman or being in Laplace in the early morning hours of March 28, 2011. However, after confronting defendant with the GPS information obtained from his telephone records showing that defendant had been in Laplace, defendant gave a second statement which was basically consistent with his trial testimony.

According to defendant, he and Ms. Coleman went to the Fir Street address to have sex. He paid her sixty dollars while they were still in the truck, and they then proceeded to go inside the trailer. After having sex, defendant and Ms. Coleman exited the bedroom and were headed toward the same door they had used to enter the trailer. Defendant claimed that Mr. Wactor was standing by the edge of the sofa close to the doorway with his hands behind his back, and Ms. Coleman was walking on the side of defendant. Defendant stated that while Ms. Coleman exited the door, Mr. Wactor "upped the gun" into his face. Defendant threw his hands up, as Ms. Coleman continued to walk out of the door. Defendant claimed that Mr. Wactor glanced over at Ms. Coleman, and as he did so, defendant went for the gun. Defendant and Mr. Wactor "tussled" for the gun, with both of them falling onto the sofa. Defendant claimed that during the struggle, the gun went off, firing a single shot into Mr. Wactor's face. Defendant said that he believed that Ms. Coleman had set him up, and he wanted to get out of the trailer fast. In an attempt to leave, defendant then fired a series of shots out the door, but he was not aiming

at anyone in particular.  Defendant then ran out the trailer door, got into his truck, and left the area, in continued fear for his life. Defendant admitted that he fired four shots out the door in rapid succession, but claimed that he did not intend to hit Ms. Coleman.[16]

### C.  Petitioner's Claims

Petitioner claims that he received ineffective assistance of counsel.  The United States Supreme Court has established a two-prong test for evaluating such claims.  Specifically, a petitioner seeking relief on such a claim is required to show both that counsel's performance was deficient *and* that the deficient performance prejudiced his defense.  Strickland v. Washington, 466 U.S. 668, 697 (1984).  The petitioner bears the burden of proof and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."  Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000).  If a court finds that the petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.  Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness."  Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998).  Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  See Strickland, 466 U.S. at 689.  "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as

---

[16] State v. Washington, 168 So. 3d 746, 747-49 (La. App. 5th Cir. 2015); State Rec., Vol. 7 of 12.

of the time of counsel's conduct.'" <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 371 (1993) (quoting <u>Strickland</u>, 466 U.S. at 690). The petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. <u>See</u> <u>Crockett v. McCotter</u>, 796 F.2d 787, 791 (5th Cir. 1986); <u>Mattheson v. King</u>, 751 F.2d 1432, 1441 (5th Cir. 1985).

The appropriate standard for determining prejudice varies slightly depending on whether a petitioner is challenging the actions of trial or appellate counsel. In order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." <u>Id.</u> In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." <u>Crockett</u>, 796 F.2d at 793. On the other hand, to prove prejudice with respect to a claim that appellate counsel was ineffective, a petitioner must show a reasonable probability that he would have prevailed on appeal but for his counsel's deficient representation. <u>Briseno v. Cockrell</u>, 274 F.3d 204, 207 (5th Cir. 2001); <u>see also</u> <u>Smith v. Robbins</u>, 528 U.S. 259, 286 (2000). Therefore, a petitioner must demonstrate a reasonable probability that, if appellate counsel's performance had not been deficient in the manner claimed, the appellate court would have vacated or reversed the trial court judgment based on the alleged error. <u>Briseno</u>, 274 F.3d at 210.

In the state post-conviction proceedings, the district court denied petitioner's ineffective assistance of counsel claims, holding:

> Petitioner alleges a claim of ineffective assistance of counsel in his application for post conviction relief. His claim of ineffective assistance of counsel

avers more specifically trial counsel's failure to object when a challenge for cause was denied, failure to use a peremptory strike after the challenge for cause was denied, failure to move for a mistrial after the jury heard hearsay testimony, and failure to request that the court admonish the jury to disregard hearsay testimony. The claim regarding ineffective assistance of appellate counsel alleges a failure to raise the issue that the state did not prove the statutory elements of the offense for which petitioner was convicted.  After review and consideration, the Court finds that all material questions of fact and law can be properly resolved without the necessity of an evidentiary hearing base [sic] upon the application, the answer, transcript and supporting documents.  La. C.Cr.P. Art. 929.

The two-pronged test employed when assessing a claim of ineffective assistance of counsel requires the defendant to show that (1) his counsel's performance was deficient, and (2) the deficiency prejudiced him.  Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  "Thus, a court deciding an actual ineffective assistance of counsel claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  Id.  To show prejudice, the defendant must demonstrate that, "but for the unprofessional conduct, the outcome of the proceedings would have been different.  Therefore, the defendant must show a reasonable probability that counsel's error so undermined the proper functioning of the adversarial process that the trial court cannot be relied upon as having produced a just result."  State v. Ratcliff, 416 So.2d 528, 531 (La. 1982).  Effective counsel has been defined to mean "not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render effective assistance."  Id.  Only if petitioner has shown both error and prejudice will his conviction be found to be unreliable and set aside.  See State v. Wright, 598 So.2d 493 (La. App. 2d Cir. 1992).  There is a strong presumption that the conduct of counsel falls within the wide range of responsible professional assistance.  State v. Myers, 583 So.2d 67 (La.App. 2d Cir.), writ denied, 585 So.2d 576 (La. 1991).

If an error falls within the ambit of trial strategy, it does not establish ineffective assistance of counsel.  State v. Bienemy, 483 So.2d 1105 (La.App. 4 Cir. 1986).  Hindsight is not the proper perspective for judging the competence of counsel's decisions because opinions may differ as to the advisability of a tactic. An attorney's level of representation may not be determined by whether a particular strategy is successful.  State v. Marino, 804 So.2d 47 (La.App. 4 Cir. 2001), citing State v. Brooks, 505 So.2d 714 (La. 1987), cert. denied, Brooks v. Louisiana, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987).  General statements and conclusory charges will not suffice.  State v. Outley, 629 So.2d 1243, 1254 (La.App. 2d Cir. 1993), writ denied, (La. 1994), 637 So.2d 476.

The Court finds nothing in Petitioner's application to support his contention that counsels' conduct fell below the range of reasonable professional assistance. Petitioner has further failed to demonstrate that but for the specific acts alleged in his application, the outcome of the trial would have been different.  Petitioner's claim of ineffective assistance falls largely within the ambit of trial strategy,

whether successful or not, and does not mandate relief to Petitioner without showing prejudice.

Regarding Petitioner's juror challenge claim, the use of peremptory challenges on other prospective jurors who could not be challenged for cause, instead of on the prospective juror for which the challenge for cause was denied, involved a trial strategy. Defense counsel's decision to leave the prospective juror, Daniel Hymel, himself a prior victim of armed robbery, on the panel after rehabilitation by the Court and defense counsel, and after positive questioning on the theory of self defense by defense counsel, fell within the specific defense strategy and its theory of self defense. Such strategy does not, in and of itself, rise to the level of ineffective assistance of counsel under the Strickland test.

Regarding Petitioner's claim pertaining to certain hearsay testimony of Scott Langford, the Court excluded the business report as evidence but only after defense counsel extensively cross examined the witness about it and a number of other issues. Again, defense counsel's decision to simply object to the document's introduction into evidence as opposed to seeking an admonishment from the Court for the jury to disregard the witness's testimony or seeking a mistrial does not meet the Strickland test to support an ineffective assistance of counsel claim. However, as pointed out by the state in its answer, there was indeed a general admonishment to the jury to disregard evidence to which an objection was sustained. (Trial Tr. at 1705:3-6). As such, there is no merit to this aspect of Petitioner's claim.

Addressing Petitioner's third claim, the decision by appellate counsel to argue the theory of self-defense on appeal, instead of the State's lack of proof of the statutory elements of the offense for which Petitioner was convicted, falls into the area of appellate strategy. To show that appellate counsel's performance was deficient, Petitioner must establish that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687, 104 S.Ct. at 2064. In reviewing claims of ineffective assistance of appellate counsel, the United States Supreme Court has expressly provided that appellate counsel "need not advance every argument, regardless of merit, urged by the defendant." Evitts v. Lucey, 469 U.S. 387, 394, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). Great deference is given by the Court to professional appellate strategy, including the focusing by counsel on one central issue even when other weaker arguments have merit. Jones v. Barnes, 463 U.S. 745, 751-2, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). Because Petitioner's claim of ineffective assistance of appellate counsel is based on failure to raise a particular issue on appeal, the second prong of the Strickland test requires Petitioner to establish that the appellate court would have granted relief, had the issue been raised. United States v. Phillips, 210 F.3d 345, 350 (5 Cir. 2000).

In the matter herein, Petitioner fails to do so on the face of his petition. Petitioner argues that appellate counsel failed to raise the issue of the requisite specific intent to kill necessary to support a conviction for attempted manslaughter, which petitioner alleges "prohibited review of whether the State proved … specific intent." Petitioner fails to establish either deficient conduct on the part of appellate

counsel or that any prejudice resulted.  He offers no support that such a claim has merit, let alone that the Appellate Court would have granted relief, had the issue been raised.

In conclusion, Petitioner has failed to show that either his trial counsel or his appellate counsel were functioning below the level guaranteed by the Sixth Amendment due to tactics and trial strategy that were not successful to the degree desired.  Petitioner simply fails to show that he received ineffective assistance of counsel under the Strickland standard.  The Court further finds that an evidentiary hearing is unnecessary.  Under the provisions of Louisiana Code of Criminal Procedure article 929, the Court has determined that the matter can be decided without further proceedings.[17]

In denying petitioner's related writ application, the Louisiana Fifth Circuit Court of Appeal

likewise held:

Relator … filed an APCR on May 22, 2017, raising three claims relating to ineffective assistance of counsel – claims one (failure of counsel to object to the denial of a challenge for cause of juror Mr. Hymel; failure of counsel to use a peremptory strike to exclude Mr. Hymel; and allowing Relator, who has an armed robbery conviction, to testify despite knowing that Mr. Hymel could not be fair and impartial because he was an armed robbery victim) and two (failure of counsel to move for a mistrial after jury heard hearsay testimony; failure of counsel to request the court admonish the jury to disregard hearsay testimony) pertained to trial counsel and claim three (failure of counsel to challenge the State's lack of proof of the statutory elements of the offense for which Relator was convicted on appeal) pertained to appellate counsel.  The district court denied Relator's claims, finding that Relator failed to carry his burden under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

In the instant writ application, Relator only challenges the district court's ruling as it pertains to claims one and two.  Upon review, we find no error in the district court's denial of Relator's claims and agree with its well-reasoned judgment.  We agree that Relator has failed to demonstrate that trial counsel's performance was deficient or that the outcome of the proceedings would have been different but for counsel's allegedly deficient performance so as to support an ineffective assistance of counsel claim under Strickland, *supra*.  Accordingly, Relator's writ application is denied.[18]

---

[17] State Rec., Vol. 7 of 12, Judgment dated July 28, 2017.
[18] Washington v. State, No. 17-KH-499 (La. App. 5th Cir. Nov. 17, 2017); State Rec., Vol. 8 of 12.

The Louisiana Supreme Court then also denied relief, simply stating: "Relator fails to show that he received ineffective assistance of counsel under the standard of <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[19]

Because an ineffective assistance of counsel claim presents a mixed question of law and fact, this Court must defer to the state court decision rejecting petitioner's claim on the merits unless the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); <u>Moore v. Cockrell</u>, 313 F.3d 880, 881 (5th Cir. 2002). Further, the United States Supreme Court has explained that, under the AEDPA, federal habeas corpus review of an ineffective assistance of counsel claim is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the <u>Strickland</u> standard was unreasonable. This is different from asking whether defense counsel's performance fell below <u>Strickland</u>'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a <u>Strickland</u> claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the <u>Strickland</u> standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." <u>Ibid</u>. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." <u>Knowles v. Mirzayance</u>, 556 U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

---

[19] <u>State *ex rel.* Washington v. State</u>, 262 So. 3d 893 (La. 2019); State Rec., Vol. 8 of 12.

Harrington v. Richter, 562 U.S. 86, 101 (2011) (citation omitted).  The Supreme Court then explained:

> Surmounting Strickland's high bar is never an easy task.  An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve.  Even under *de novo* review, the standard for judging counsel's representation is a most deferential one.  Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.  It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence.  The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.
>
> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult.  *The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.*  The Strickland standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d).  *When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.*

Id. at 105 (emphasis added; citations omitted).  Therefore, on a habeas review of an ineffective assistance claim, "federal courts are to afford *both* the state court *and* the defense attorney the benefit of the doubt."  Woods v. Etherton, 136 S. Ct. 1149, 1151 (2016) (emphasis added; quotation marks omitted).  For the following reasons, the Court finds that, under those stringently deferential standards, it simply cannot be said that relief is warranted with respect to petitioner's ineffective assistance of counsel claims.

Petitioner's first two claims concern juror Daniel Hymel, Jr.  During voir dire, Hymel revealed that he had previously been the victim of an armed robbery.[20]  He stated that he

---

[20] State Rec., Vol. 4 of 12, trial transcript, p. 873.

"probably" would be unable to be fair and impartial because of that experience.[21]  When he said

that he was not satisfied with how his criminal case was resolved, the following exchange occurred:

> MR. PRESCOTT [the prosecutor]:
> … I apologize that you weren't satisfied with that.  Would, would that affect your ability to give this gentleman a fair trial?
>
> MR. HYMEL:
> I'm not familiar with this gentleman but I'm still bitter about it.
>
> MR. PRESCOTT:
> You're still bitter about it.  Okay.  But you could put that aside and, and look at this evidence –
>
> MR. HYMEL:
> I don't know.
>
> MR. PRESCOTT:
> I'm sorry?
>
> MR. HYMEL:
> To be perfectly honest with you, I don't know.
>
> MR. PRESCOTT:
> You don't know?
>
> MR. HYMEL:
> No.
>
> MR. PRESCOTT:
> Even if the judge told you, you know –
>
> MR. HYMEL:
> I'd listen to what the Judge tells me.
>
> MR. PRESCOTT:
> Sure.  And then whenever the witnesses get on there you would judge each of them individually with what they're saying as to believe whether it was true or not?  I mean –

---

[21] Id. at p. 875.

MR. HYMEL:

I would think I can do that in this case but I have some reservations about guns.

MR. PRESCOTT:

About guns.  Can you expound on that for me?

MR. HYMEL:

Well, when you have a gun in your face and the first thing you think of is you're going to die over a minimum amount of money it certainly is not something that I would wish on anyone.

MR. PRESCOTT:

Okay.  So what about a case where someone doesn't have a gun?  Would it, would it be okay for another person with a gun to, to, to shoot them injuring –

MR. HYMEL:

If I'd have had a gun I'd have shot him.[22]

Hymel was also questioned about his view of self-defense:

MR. REGAN [defense counsel]:

… If, if the opportunity was there and someone stuck a gun in your face and you had the ability to turn that gun back on him, would you do that in self-defense?

MR. HYMEL:

Yes.

MR. REGAN:

Again, the law says if somebody puts a gun in your face you have the right to turn it around and defend yourself.  Are you good with that?

MR. HYMEL:

Yes.

MR. REGAN:

All right.  Anybody disagrees with that, that if somebody comes at you with a deadly weapon you have a right to defend yourself?  We're good?  Okay.

Now, I think what you were suggesting is that, is that because of that event you might not be able to be fair.  If this case turns on self-defense could you be fair?

---

[22] Id. at pp. 902-04.

MR. HYMEL:
        Yes.

MR. REGAN:
        Would you speak your mind?

MR. HYMEL:
        Yes.

MR. REGAN:
        Let the rest of the jurors know what it's like to be put under the threat of a death situation?

MR. HYMEL:
        Yes.

MR. REGAN:
        Thank you.  So if I asked you to sit on this case would you sit and be fair with both sides?

MR. HYMEL:
        I would do my best.[23]

Later during voir dire, the following exchange occurred:

THE COURT:
        ….
        Mr. Hymel, you earlier said you really didn't think you could be fair because of what happened to you, it would play too much of a role in your own judgment, but later on when you were questioned you said – well, he was questioning you basically about self-defense.  But he asked you if you could be fair about that and you said yes.  So I've got to ask you, based on what happened to you – and, look, it's perfectly understandable – do you think you could put that aside sufficiently to focus just on the evidence and law in this courtroom and return a decision that's fair and not based on what happened to you?

MR. HYMEL:
        Yes, Your Honor.

THE COURT:
        You can?

---

[23] Id. at pp. 964-65.

MR. HYMEL:
Yes.[24]

When the judge first asked whether the defense had any challenges for cause, Mr. Regan

asked to confer with this client regarding Mr. Hymel.  After their conversation, Mr. Regan said

that the defense had no challenges for cause.[25]  However, shortly thereafter, Mr. Regan changed

course, stating:

MR. REGAN:
Judge before we – And I know what you just said and I don't mean to be
contentious, but we would challenge Mr. Hymel in the first row for cause.  He had
been the victim of an armed robbery.  He said that he couldn't be fair because of
that.  He never got rehabilitated on that issue.  I like what he said about self-defense,
but the bottom line is that he had been robbed at gunpoint, East Baton Rouge Parish,
felt that, that his life was in danger.

THE COURT:
I heard everything he said.

MR. REGAN:
Challenge for cause.

THE COURT:
You object?

MR. PRESCOTT:
Yes, Your Honor, we object.  He, –

THE COURT:
I –

MR. PRESCOTT:
He was rehabilitated by you.  He said that he could be fair and he would
listen to the law as you gave it to him.

THE COURT:
I thought Mr. Regan himself had rehabilitated him –

---

[24] Id. at p. 993.
[25] State Rec., Vol. 5 of 12, trial transcript, p. 1004.

MR. PRESCOTT:
     I kind of thought so too.

THE COURT:
     – in his questioning –

MR. REGAN:
     On the self-defense issue.

THE COURT:
     – and then I followed up and I was satisfied he was rehabilitated, so that's denied.[26]

In his first two claims, petitioner argues that counsel was ineffective for failing (1) to object to the trial court's ruling denying the challenge for cause as to Hymel and (2) to use a peremptory strike to remove Hymel.

As to the first claim, the essence of petitioner's argument is that counsel's failure to object to the court's ruling waived appellate review of the denial of the challenge for cause,[27] and he was therefore prejudiced because the denial of the challenge constituted reversible error. However, even assuming for the purposes of this decision that counsel's failure to object constituted deficient performance, the Court finds that no prejudice resulted. The Louisiana Supreme Court has held:

> A trial judge is vested with broad discretion in ruling on challenges for cause, and such a ruling is subject to reversal only when a review of the entire *voir dire* reveals the judge abused his discretion. The trial judge's refusal to excuse a prospective juror on the ground he is not impartial is not an abuse of discretion where, after further inquiry or instruction (frequently called "rehabilitation"), the prospective juror has demonstrated a willingness and ability to decide the case impartially according to the law and the evidence.

---

[26] Id. at pp. 1005-06.
[27] La. Code of Crim. Proc. art. 800(A) ("A defendant may not assign as error a ruling refusing to sustain a challenge for cause made by him, unless an objection thereto is made at the time of the ruling.").

State v. Dotson, 234 So. 3d 34, 39 (La. 2017) (citation omitted); State v. Sparks, 68 So. 3d 435, 461 (La. 2011). Here, Hymel was adequately rehabilitated. Therefore, even if the error had been preserved for appellate review, there is no reasonable probability that a Louisiana appellate court would have reversed petitioner's conviction.

As to the claim regarding counsel's decision not to use a peremptory strike to remove Hymel, it is clear that an "attorney's actions during voir dire are considered to be a matter of trial strategy. A decision regarding trial tactics cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be so ill chosen that it permeates the entire trial with obvious unfairness." Teague v. Scott, 60 F.3d 1167, 1172 (5th Cir. 1995) (quotation marks omitted). This general rule applies to an attorney's decision as to whether to exercise a peremptory strike. See, e.g., Ray v. Johnson, No. 98-10659, 1999 WL 800173, at *1 (5th Cir. Sept. 20, 1999); Tolliver v. United States, No. 07-cv-525, 2009 WL 1393300, at *6 (S.D. Ill. May 15, 2009) ("[T]he decision of when to use a peremptory strike lies firmly within the realm of 'strategic choices' that the Court will not second guess on collateral review.").

Further, where, as here, the state courts rejected such a claim, "the question for a federal court on habeas review is not whether it would have made the same decision on direct review, but whether clearly established Supreme Court precedent precluded the state courts from reaching such a conclusion." Lugo v. LaValley, 601 F. App'x 46, 48 (2d Cir. 2015). In the instant case, it does not. On the contrary, the Supreme Court has explained:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of

hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.   Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.  There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

Strickland, 466 U.S. at 689 (citations and quotation marks omitted).

Here, defense counsel could exercise only twelve peremptory strikes.  La. Code Crim. P. art. 799 ("In trials of offenses punishable by death or necessarily by imprisonment at hard labor, each defendant shall have twelve peremptory challenges ….).  During the first panel, he exercised nine peremptory strikes initially, and then he also exercised two more as "back strikes."[28]  At that point, only ten jurors had been selected.[29] As a result, two additional jurors still had to be seated, and defense counsel had only one peremptory strike remaining.   Counsel did not perform deficiently in opting to forego the peremptory strike of Hymel, a juror who had been rehabilitated and strongly favored self-defense, and to instead keep his one remaining peremptory strike in his quiver in case it was needed to remove another potentially more problematic juror on the second panel.  See Gardner v. Ozmint, 511 F.3d 420, 425-26 (4th Cir. 2007).  Such conduct "easily falls within an objective standard of reasonableness and conforms with prevailing professional norms." Id. at 426.[30]

---

[28] State Rec., Vol. 5 of 12, trial transcript, pp. 1007 and 1010.

[29] Id. at p. 1010.

[30] Because this second claim clearly fails on the deficient-performance prong of the Strickland analysis, the Court need not consider the prejudice prong.  However, out of an abundance of caution, the Court notes that petitioner has offered no evidence showing that he was in fact prejudiced by Hymel's service on the jury.

Petitioner's third claim is that counsel was ineffective for allowing petitioner, a convicted armed robber, to testify in light of the fact that Hymel still bore resentment from his own armed robbery. However, the decision as to whether to put a criminal defendant on the stand "is a 'judgment call' which should not easily be condemned with the benefit of hindsight." United States v. Garcia, 762 F.2d 1222, 1226 (5th Cir. 1985); accord United States v. Mullins, 315 F.3d 449, 453 (5th Cir. 2002). Further, such a matter is inherently one of trial strategy, and, as already noted, federal habeas courts generally are not to second-guess counsel's decisions on matters of trial tactics; rather, courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy. Strickland, 466 U.S. at 689. In the instant case, there is no sound basis for such second-guessing.

Here, the defense's version of events was that petitioner was the intended victim of a crime perpetrated by Wactor (and possibly Coleman) and that petitioner simply fired the gun in self-defense as he fled in fear of his life. That defense had already proved successful in the original trial on the charge arising from Wactor's shooting, and defense counsel obviously hoped to repeat that same success in the retrial concerning Coleman's shooting. Further, it is reasonable to assume that such a defense would be bolstered by petitioner's own compelling testimony concerning the events and the fear he experienced.

Further, the fact that Hymel was seated on the jury was not necessarily a reason to be concerned with respect to petitioner's testimony. It is true that Hymel resented the fact that he had been the victim of an armed robbery, and it is possible that he would take a dim view of petitioner, who had a prior armed robbery conviction, a fact that would be revealed to the jury if petitioner

22

testified at trial.  However, that possibility was somewhat diminished by the fact that petitioner's

crime occurred more than twenty years earlier when at the age of seventeen he, along with several

other youths, robbed a deliveryman of pizza.[31]

Moreover, it is at least equally plausible that Hymel would in fact identify and perhaps

sympathize with petitioner because, at least according to the defense theory of the case, they shared

a similar experience.  As already noted *supra*, Hymel, during voir dire, spoke about what it is like

to be the victim of gun violence:

> MR. HYMEL:
>        Well, when you have a gun in your face and the first thing you think of is
> you're going to die over a minimum amount of money *it certainly is not something
> that I would wish on anyone.*
>
> MR. PRESCOTT:
>        Okay.  So what about a case where someone doesn't have a gun?  Would it,
> would it be okay for another person with a gun to, to, to shoot them injuring –
>
> MR. HYMEL:
>        *If I'd have had a gun I'd have shot him.*[32]

He also noted that, if chosen, he would share his views on that issue with his fellow jurors:

> MR. REGAN:
>        Would you speak your mind?
>
> MR. HYMEL:
>        Yes.
>
> MR. REGAN:
>        Let the rest of the jurors know what it's like to be put under the threat of a
> death situation?
>
> MR. HYMEL:
>        Yes.[33]

---

[31] State Rec., Vol. 7 of 12, trial transcript, p. 1528.
[32] State Rec., Vol. 4 of 12, trial transcript, pp. 903-04 (emphasis added).
[33] Id. at p. 965.

In the instant case, the evidence showed that it was Wactor who brandished the only gun involved in the incident, and the defense attempted to suggest that petitioner was the intended victim of an armed robbery.[34] Moreover, while questioning petitioner, defense counsel even made a rather obvious attempt to elicit Hymel's sympathies by alluding to those statements he made during voir dire:

Q. [by defense counsel]  Did you do anything to cause [Wactor] to pull a gun on you?

A.  [by petitioner]  No, sir.

Q.  Once that shot went off at this point, what, what was the next step?  What was – what were you thinking at this point?  Having seen what's going on, what were you thinking?

A.  Trying to get – I was trying to get out of there with my life.

Q.  Okay.  And did you have any thoughts about what was going on there between Coleman and Wactor?

A.  Yes, sir.

Q.  And what were your thoughts?  What were you thinking?

A.  From how everything played out that Carolyn Coleman set me up.

Q.  Let me ask you this.  You tell us – *and we've heard a little bit when we were doing earlier voir dire.  What is it like to have a gun pointed at your face?*

A.  It's not no good feelings.  You have all kinds of thoughts running through your mind, not knowing if this person is going to shoot and kill you.  You looking down the barrel of a gun.[35]

---

[34] <u>See</u> State Rec., Vol. 7 of 12, trial transcript, p. 1525.
[35] State Rec., Vol. 6 of 12, trial transcript, p. 1453.

Accordingly, it is apparent that defense counsel handled this dilemma quite deftly. For the state courts to find that counsel was not ineffective in this respect was eminently reasonable.

Petitioner's next two claims concern the testimony of Scott Langford.[36] The state called Langford as a rebuttal witness regarding petitioner's testimony that he held a supervisory position and earned twelve dollars an hour at the New Orleans Hamburger and Seafood Company. In connection with his testimony, Langford also testified regarding payroll records from the restaurant; however, those records were ultimately deemed inadmissible because they were not prepared by Langdon himself.[37] Petitioner now claims that counsel was ineffective for failing to move for a mistrial or request an admonishment once the underlying records were found to be inadmissible.

As to counsel's failure to move for a mistrial, no mistrial was warranted. Langford's testimony was primarily based on his own personal knowledge and his testimony regarding the payroll records was of little consequence. Moreover, his lack of direct knowledge of the records was fully explored on cross-examination[38] and, as noted, the records were ultimately deemed inadmissible. While his testimony regarding the inadmissible records would have been better avoided, there is no reasonable probability that a mistrial would have been granted even if requested. This did not involve a matter for which a mistrial is mandatory. See La. Code Crim. P. art. 770. Further, although the trial judge nevertheless had the discretion to grant a mistrial, it is unlikely he would have done so:

> Under La.C.Cr.P. art. 771, a mistrial is discretionary when a witness makes
> an irrelevant remark that might prejudice the defendant. Article 771 gives the trial

---

[36] Langford's testimony is found at pages 1586-1616 of the trial transcript in Volume 7 of the state court record.
[37] State Rec., Vol. 7 of 12, trial transcript pp. 1613-15.
[38] Id. at pp. 1591-93.

court the option to either admonish the jury, upon motion of the defendant, or, if an admonition does not appear sufficient, to declare a mistrial.

A mistrial should be granted under Article 771 only where the prejudicial remarks of the witness make it impossible for the defendant to obtain a fair trial.

A mistrial is a drastic remedy and is warranted only when trial error results in substantial prejudice to a defendant that deprives him of a reasonable expectation of a fair trial.

State v. Wall, 209 So. 3d 962, 971 (La. App. 5th Cir. 2014) (citations omitted); see State v. Galliano, 945 So. 2d 701, 717-18 (La. App. 5th Cir. 2006) (finding that mistrial was not warranted based on jurors' awareness of excluded evidence).

As to counsel's failure to request an admonishment, a decision on such matter is one of trial strategy and, as such, is again subject to "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. Petitioner has not overcome that presumption in the instant case. Here, defense counsel did an excellent job of highlighting the fact that Langford did not prepare the payroll records, was not very familiar with them, and in fact found them "a little confusing."[39] In light of that testimony, the persuasiveness of Langford's testimony regarding the records was already greatly diminished. Moreover, the records themselves were deemed inadmissible and defense counsel was presumably aware that the jury would be given a general admonishment regarding evidence found to be inadmissible. Further, the jury was in fact instructed: "You must consider only evidence which was admitted during the trial. You may not consider evidence which you were instructed to disregard or to which an objection was sustained."[40] In light of those considerations, it cannot be

---

[39] Id. at p. 1592.
[40] Id. at p. 1705.

said either that defense counsel performed deficiently by failing to request a special admonishment or that any prejudice resulted.

In summary, to be entitled to relief, petitioner must demonstrate that the state court decision rejecting his ineffective assistance of trial counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. He clearly has not made that showing in the instant case. Accordingly, utilizing the AEDPA's doubly deferential standards of review applicable to such claims, this Court should likewise deny relief.

Lastly, although it is not entirely clear, it appears that petitioner may be asserting a claim that his appellate counsel was ineffective. On the first page of the memorandum accompanying his application, petitioner states that "[h]e received ineffective assistance of appellate counsel."[41] However, that claim is neither listed on his federal application form nor discussed in his accompanying memorandum.

Further, although he included such a claim in his state post-conviction application, he omitted the claim from his related writ applications filed with the Louisiana Fifth Circuit Court of Appeal and the Louisiana Supreme Court.[42] As a result, any such claim is unexhausted.[43] Nevertheless, even if petitioner is asserting such a claim in this proceeding, the Court should simply deny it because it is meritless for the following reasons. See 28 U.S.C. § 2254(b)(2) ("An

---

[41] Rec. Doc. 1-1, p. 1.

[42] See State Rec., Vols. 11 and 12 of 12.

[43] "Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." Baldwin v. Reese, 541 U.S. 27, 29 (2004) (quotation marks omitted). That requirement applies to all levels of review in the state court system, meaning that a petitioner's federal claims must have been fairly presented to "each appropriate state court (including a state supreme court with powers of discretionary review)." Id.

application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

With respect to claims that appellate counsel was ineffective, it must be remembered that counsel "is not obligated to urge on appeal every nonfrivolous issue that might be raised (not even those requested by defendant)."  West v. Johnson, 92 F.3d 1385, 1396 (5th Cir. 1996).  Rather, "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."  Jones v. Barnes, 463 U.S. 745, 751-52 (1983).  Far from evidencing ineffectiveness, an appellant counsel's restraint often benefits his client because "a brief that raises every colorable issue runs the risk of burying good arguments ... in a verbal mound made up of strong and weak contentions."  Id. at 753.  As a result, the applicable test to be applied in assessing such a claim is whether the issue ignored by appellate counsel was "clearly stronger" than the issues actually presented on appeal.  See, e.g., Diaz v. Quarterman, 228 F. App'x 417, 427 (5th Cir. 2007); accord Smith v. Robbins, 528 U.S. 259, 288 (2000).

In the instant case, appellate counsel raised two assignments of error on direct appeal:  (1) petitioner's conviction for the attempted manslaughter of Ms. Coleman after a retrial violated the principles of double jeopardy; and (2) there was insufficient evidence to support his conviction. Here, petitioner does not even identify in his federal application what other claim or claims he believes that his appellate counsel should have raised, much less show that they were "clearly stronger" than the two claims raised by appellate counsel.  Accordingly, his claim necessarily fails. See, e.g., Galjour v. Cain, Civ. Action No. 13-5878, 2015 WL 349317, at *13 (E.D. La. Jan. 26,

2015); Cox v. Cain, Civ. Action No. 10-1596, 2010 WL 6032638, at *13 (E.D. La. Nov. 23, 2010), adopted, 2011 WL 870597 (E.D. La. Mar. 9, 2011).

## RECOMMENDATION

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Rodney Washington be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[44]

New Orleans, Louisiana, this first day of July, 2019.


**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**

---

[44] Douglass referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.